**BEFORE THE UNITED STATES JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: SMITH & NEPHEW BHR & R3 HIP IMPLANT PRODUCTS LIABILITY LITIGATION | ) | MDL No. 2775 |

**DEFENDANT SMITH & NEPHEW, INC.'S RESPONSE IN OPPOSITION TO MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR CONSOLIDATED PRETRIAL PROCEEDINGS**

Defendant Smith & Nephew, Inc. ("Smith & Nephew") submits this response in opposition to the Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Consolidated Pretrial Proceedings [D.E. 1-1] ("Petition" or "Pls. Br.") requesting centralization of all federal court cases alleging injury from Smith & Nephew metal-on-metal hip resurfacing ("BHR") *and* total hip replacement constructs including the R3 metal liner ("R3 ML").

Movants[1] seek to consolidate cases involving separate and distinct hip implant constructs that were subject to different regulatory regimes – the BHR was subject to FDA premarket approval ("PMA") whereas R3 ML cases involve PMA *and* 510(k)-cleared components. Because of this key difference, court opinions addressing federal preemption have significantly narrowed or dismissed plaintiffs' claims in BHR cases, resulting in diverging legal claims, core issues, and relevant discovery as compared to cases involving 510(k)-cleared components and making these cases wholly unsuitable for centralization. Indeed, Movants' "common questions," Pls. Br. at 6, dissipate when considered across BHR and R3 ML cases. *See infra* 14. For this

[1] The "Movants" are plaintiffs in *Crews v. Smith & Nephew, Inc.*, 5:16-cv-471 (E.D. Ky.); *Grazia v. Smith & Nephew, Inc.*, 1:16-cv-3051 (N.D. Ohio); *Hand v. Smith & Nephew, Inc.*, 1:17-cv-432 (N.D. Ill.); *Kruse v. Smith & Nephew, Inc.*, 1:16-cv-3117 (D. Colo.); *Leblanc v. Smith & Nephew, Inc.*, 4:17-cv-00022 (S.D. Tex.); *Marion v. Smith & Nephew, Inc.*, 1:15-cv-96 (D. Utah); *Rand v. Smith & Nephew, Inc.*, 2:16-cv-09383 (C.D. Cal.), and *Zingler v. Smith & Nephew, Inc.*, 1:16-cv-01599 (E.D. Wis.).

important reason, the Smith & Nephew hip implant litigation is fundamentally different from prior "metal-on-metal" hip replacement litigations for which the Panel has created MDLs. *See* Pls. Br. at 1 (citing metal-on-metal hip product MDLs).

Moreover, this Petition is stale and untimely. Metal-on-metal hip implant litigation has been ongoing for nearly a decade, with MDLs created between 2010 and 2013 regarding other manufacturers' products. Smith & Nephew introduced its first metal-on-metal hip implant system in the United States in 2006, and has had litigation pending since 2010, but centralization of the Smith & Nephew cases has not been requested until now. Centralization at this late date is unnecessary and will undermine judicial efficiency, as Smith & Nephew has successfully coordinated and disposed of the majority of cases, and motions to dismiss based on federal preemption are already briefed in several remaining cases.

For these reasons and those described more fully below, Movants' eleventh-hour effort to revitalize and accumulate cases through centralization should be denied and no MDL should be created for Smith & Nephew hip implant products liability litigation. To the extent the Panel determines otherwise, however, any MDL that is established over Smith & Nephew's objection should only include BHR cases, and those cases should be transferred to the District Court for the Western District of Tennessee, Western Division – the location of Smith & Nephew's U.S. headquarters.

## BACKGROUND

### I. THE CASES INVOLVE DIFFERENT PRODUCTS WITH DISTINCT LEGAL AND FACTUAL ISSUES

Movants seek to centralize BHR cases with cases involving 510(k)-cleared components to create an "apples to oranges" MDL of cases involving different components implanted through different procedures (resurfacing vs. total hip arthroplasty) and approved or cleared for

marketing through different regulatory mechanisms. *See* Pls. Br. at 7 (acknowledging "design differences between the BHR and R3"); *Crews*, 5:16-cv-471 (E.D. Ky.), Compl. [D.E. 1-5] ¶ 8 ("In a resurfacing arthroplasty, the femoral head is not removed but is instead trimmed and capped (resurfaced) with a smooth metal covering. This procedure differs from a total hip replacement, which includes the placement of a prosthetic femoral stem."); *Starcher v. Smith & Nephew, Inc.*, No. 2:17-cv-00609 (S.D.W. Va.), Compl. [D.E. 1-17] ¶¶ 7, 9 (distinguishing premarket approval of Class III BHR System with § 510(k) clearance of various Class II components at issue in R3 ML cases).

**A. BHR Cases**

The BHR System is a "hip resurfacing prosthesis that consists of two constituent components: (1) a Birmingham Resurfacing Femoral Head . . .; and (2) a Birmingham Hip Resurfacing Acetabular Cup . . ." *Raab,* 150 F. Supp. 3d at 671. In a "resurfacing" procedure, the acetabular component (*i.e.*, a shallow cup) replaces the damaged surface of a patient's hip socket. The femoral resurfacing component (*i.e.*, a cap) covers the ball-shaped bone at the top of the patient's thigh (the "femoral head"). The procedure is referred to as "resurfacing," because "only the surface of the [patient's] femoral head is removed to implant the femoral (ball) head resurfacing component."[2]

Like Movants, plaintiffs in the BHR cases allege that they received the BHR System – a PMA-approved Class III medical device – through the resurfacing procedure, and that they suffered various injuries resulting from metal-on-metal articulation of the BHR femoral head and

[2] *See* U.S. Food & Drug Admin., "Birmingham Hip Resurfacing (BHR) System – P040033," http://wayback.archive-it.org/7993/20170112092422/http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalsandClearances/Recently-ApprovedDevices/ucm078189.htm (last visited Feb. 15, 2017).

acetabular cup.[3] *See, e.g.*, *Williams v. Smith & Nephew, Inc.*, 14-cv-3138 (D. Md.), Compl. [D.E. 1-13] ¶¶ 6, 11-17. Plaintiffs assert state law-specific tort causes of action such as negligence, strict liability, and breach of warranty. *Id.* ¶¶ 18-44; *see also, e.g., Marion v. Smith & Nephew, Inc.*, No. 1:15-cv-96 (D. Utah), Compl. [D.E. 1-10] ¶¶ 55-141 (plaintiff in BHR case alleging negligence, strict liability, breach of warranty, misrepresentation/fraud, unfair and deceptive trade practices, negligent infliction of emotional distress, and loss of consortium). To hold Smith & Nephew liable, and avoid express preemption of their tort claims, plaintiffs in BHR cases must show, at minimum, that Smith & Nephew violated PMA-imposed requirements, and that they have asserted viable state law causes of action that parallel those requirements. *See, e.g., Williams v. Smith & Nephew, Inc.*, 123 F. Supp. 3d 733, 740-45 (D. Md.); *Marion v. Smith & Nephew, Inc.*, No. 1:15-cv-96, 2016 WL 4098608 at *3 (D. Utah July 28, 2016).

**B. R3 ML and Conversion Cases**

The R3 ML cases, by contrast, address a distinct set of components used for a total hip replacement: (1) an R3 acetabular cup; (2) a metal liner; (3) a modular femoral head; and (4) a hip stem, none of which are at issue in any BHR case. *See, e.g., Cochran v. Smith & Nephew, Inc.*, No. 1:16-cv-01121 (C.D. Ill.), Compl. [D.E. 1-25] ¶ 14-15. Unlike the "resurfacing" procedure involved in BHR cases, a total hip replacement involves removal of the patient's *entire* femoral head and replacement with a prosthetic femoral head. After the patient's hip socket (acetabulum) is replaced with a prosthetic cup (*i.e.*, the "acetabular cup"), the femur is reamed to receive an uncemented hip stem upon which is mounted the prosthetic femoral head.

[3] Movants' Schedule of Actions identifies 22 active BHR cases. Preemption dismissal was granted in *Spellman v. Smith & Nephew, Inc.*, and the case was dismissed with prejudice. *See* Judgment of Dismissal in a Civil Case [D.E. 31 in 3:16-cv-08080] (D. Ariz. Feb. 22, 2017).

The "metal liner" (component (2) above) is inserted into the acetabular cup, fitting between the surfaces of the cup and femoral head.[4]

The modular femoral head and hip stem used in R3 ML cases (components (3) and (4) above) were cleared for marketing through FDA's 510(k) process. *See, e.g., LaFountain v. Smith & Nephew*, No. 3:14-cv-01598, 2016 WL 3919796 at *1 (D. Conn. July 18, 2016). The R3 metal liner and acetabular cup were approved through the supplemental PMA process for use with the BHR System, and the acetabular cup also received 510(k) clearance for use with either a polyethylene or ceramic liner in total hip replacements. While plaintiffs in the four (4) remaining R3 ML cases[5] allege injuries caused by metal-on-metal articulation of the R3 metal liner with both the acetabular cup and the components cleared through the 510(k) process, they also allege injury through a distinct theory of "taper corrosion" of the femoral components, which are not present in BHR cases. *See, e.g., LaFountain*, 3:14-cv-01598 (D. Conn.), Compl. [D.E. 1-20] ¶ 37 (alleging that the modular femoral head has "been linked to the accelerated release of metal debris and ions into the body/blood stream from . . . taper corrosion"), ¶ 58 (alleging injuries from "articulation" of the R3 metal liner with the femoral head and other

[4] *See* U.S. Food & Drug Admin., "Hip Implants," http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/MetalonMetalHipImplants/ucm241594.htm (last visited Feb. 21, 2017); *Cochran*, No. 1:16-cv-01121 (C.D. Ill.), Compl. [D.E. 1-25] ¶¶ 14-16 (describing total hip replacement).

[5] The four R3 ML cases, which Movants claim should be centralized with the BHR cases, are *Starcher v. Smith & Nephew, Inc.*, 2:17-cv-00609 (S.D.W. Va.); *LaFountain v. Smith & Nephew, Inc.*, 3:14-cv-01598 (D. Conn.); *Tipsord v. Smith & Nephew, Inc.*, 1:16-cv-1339 (N.D. Tex.); and *Cochran v. Smith & Nephew, Inc.*, 1:16-cv-01121 (C.D. Ill.), and summary judgment motions are under advisement in two of these cases (*Tipsord* and *Cochran*). Movants' Schedule of Actions includes a fifth R3 ML case that was remanded to state court after the Petition was filed, *see Kirby v. Smith & Nephew, Inc.*, Mem. Opp. & Order [D.E. 19 in 3:15-cv-02543] (N.D. Tex. Feb. 17, 2017), and another that has settled and been dismissed, *see Felger v. Smith & Nephew, Inc.*, (Stipulation and Order of Dismissal [D.E. 24 and 25 in 3:15-cv-210] (D. Alaska Jan. 25 and 26, 2017).

components); *Cochran*, 1:16-cv-01121 (C.D. Ill.), Compl. [D.E. 1-25] ¶¶ 27-28 (alleging injuries caused by "the R3 Acetabular System and its R3 Metal Liner"), ¶ 38 (alleging that "Plaintiff's R3 Acetabular System . . . had mechanical failure, including . . . excessive corrosion"). Moreover, because plaintiffs in R3 ML cases received the R3 metal liner outside the approved indication for use with the BHR System, certain plaintiffs have asserted claims based on off-label promotion and use, *see, e.g., LaFountain*, 2016 WL 3919796 at *2 (plaintiff alleged Smith & Nephew "misbranded its R3 Acetabular Liner to be used in applications other than the BHR System"), whereas plaintiffs receiving the BHR System have no such claims.

Movants' Schedule of Actions also includes two (2) active "conversion" cases, in which plaintiffs initially received a BHR System in a resurfacing procedure and were subsequently "converted" to a total hip construct by replacing the BHR femoral head with 510(k)-cleared total hip components (*i.e.*, modular femoral head, modular head sleeve, and femoral component). *See Raab v. Smith & Nephew, Inc.*, No. 2:14-cv-30279 (S.D.W. Va.) and *McAnneny v. Smith & Nephew, Inc.*, No. 3:17-cv-12 (D. Conn.). Plaintiffs' claims in the "conversion" cases are analogous to those in the R3 ML cases in that they are based on both PMA and 510(k)-cleared components. Specifically, plaintiffs in "conversion" cases received a component from the PMA-approved BHR System (the BHR Acetabular Cup), and allege injuries caused by the combination of the PMA-approved acetabular cup with 510(k)-cleared device components received during their "conversion" surgeries. *See, e.g., id.*, Compl. [D.E. 1-29] ¶¶ 10-11, Count II.[6]

[6] Because conversion cases, like R3 ML cases, involve injuries allegedly caused at least in part from 510(k)-cleared devices, and because these two groups of cases share other relevant similarities discussed herein, these two groups of cases should be addressed together in the Panel's decision whether to create an MDL.

### C. BHR and R3 ML/Conversion Cases Are Factually and Legally Distinct

The factual and legal differences that arise from the components in the BHR and R3 ML/conversion cases having entirely different regulatory approvals or clearances are paramount. The BHR System is a Class III medical device approved through the FDA's PMA process in 2006. *Raab*, 150 F. Supp. 3d at 678; *see also Williams*, 123 F. Supp. 3d at 737. The modular femoral head and hip stem at issue in R3 ML cases, by contrast, are Class II medical devices cleared for marketing through FDA's § 510(k) process. *See, e.g., Starcher*, No. 2:17-cv-609 (S.D.W. Va.), Compl. [D.E. 1-17] ¶ 9. In light of this distinction, courts have analyzed BHR and R3 ML/conversion cases under entirely different legal frameworks. Namely, pursuant to the express preemption clause contained in the Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act, various state law tort claims regarding the BHR System have largely been rejected as expressly preempted by federal law, while claims asserted in R3 ML/conversion cases regarding the 510(k)-cleared components have not been held to be expressly preempted. *Compare, e.g., Williams*, 123 F. Supp. 3d 733 (dismissing, as preempted, claims in BHR case for design defect, breach of implied warranty, and breach of express warranty based on FDA-approved labeling); *Marion*, 2016 WL 4098608 (dismissing claims in BHR case for defective manufacturing, failure to warn, breach of express and implied warranty, negligent misrepresentation, and fraudulent concealment as preempted and/or for failure to state a claim); *Spellman v. Smith & Nephew, Inc.*, No. 3:16-cv-08080, 2016 WL 5364206 (D. Ariz. Sept. 26, 2016) (dismissing all claims in BHR case as expressly preempted) *with LaFountain*, 2016 WL 3919796 at *6 (in R3 ML case, allowing design defect, manufacturing defect, and failure to warn claims); *see also Raab*, 150 F. Supp. 3d at 699-701 (allowing design defect, failure to warn, and breach of implied warranty of merchantability claims in conversion case). It is axiomatic that

FDA's PMA approval and 510(k) clearance processes are entirely distinct, and result in divergent preemption defenses. Accordingly, BHR and R3 ML/conversion cases inevitably present distinctive factual and legal questions involving unique theories of liability and different discovery.[7]

In addition to their different regulatory processes, components, and placement procedures, BHR and R3 ML/conversion cases also involve different manufacturing processes, indications for use, labeling, marketing, and recall/market action histories. In June 2015, the smaller-sized BHR femoral resurfacing heads and acetabular cups – not the entire "BHR device" as incorrectly represented by Movants (Pls. Br. at 2) – were recalled based on data collected from that National Joint Registry of England and Wales, and the BHR System was contraindicated in women. With respect to the components at issue in R3 ML cases, there has been no recall of the acetabular cup or femoral head, but in June 2012, Smith & Nephew withdrew the R3 metal liner from the marketplace, and sale of the modular femoral head was discontinued in March 2015. Thus, questions regarding development, design, manufacture, testing, promotion and labeling will vary depending on the specific product implanted in any given case.

---

[7] Movants' argument that "the same pre-emption issues" surround the BHR and R3 ML cases (Pls. Br. at 7) is belied by the significantly different regulatory histories highlighted in the same complaints for which Movants seek centralization. Although the acetabular cup and R3 metal liner were approved through the PMA process for use with the BHR System, the femoral head and hip stem at issue in the R3 ML cases were cleared through the § 510(k) process. Thus, while plaintiffs' claims in R3 ML cases that pertain to PMA-approved components are preempted, the PMA express preemption analysis does not apply to their claims regarding 510(k)-cleared femoral components. Plaintiffs in R3 ML cases also assert claims for alleged off-label promotion of PMA components for use with 510(k) components. Those claims are not present in BHR cases.

## II. LITIGATION INVOLVING SMITH & NEPHEW BHR AND R3 ML/CONVERSION PRODUCTS

Over the past four-plus years, approximately 495 cases have been filed in state and federal courts regarding Smith & Nephew hip implant systems. In 2013, cases pending in Tennessee state court were consolidated in Shelby County, Tennessee before Judge Donna Fields. With the assistance of Special Master Janice Holder, a former Tennessee Supreme Court Justice appointed by Judge Fields, the vast majority of cases in Shelby County (at least 388 cases) have already been resolved by the parties. Currently, only twenty-six cases remain pending in Shelby County, while six cases are pending in other state courts. Smith & Nephew continues to work with lead counsel in the Shelby County cases towards the resolution of remaining claims.

In both state and federal courts, the parties have resolved nearly all R3 ML cases. Indeed, only eleven such cases remain pending in state courts, and Movants' Petition identifies only four such cases remaining in federal courts.[8] Among those R3 ML cases served and still pending in state and federal courts, the parties remain engaged in ongoing settlement discussions. Likewise, ***almost two-thirds*** of BHR cases filed in federal and state court have been dismissed (65 out of 104 cases). Additional motions to dismiss on preemption grounds are likely to resolve many – if not all – of the remaining claims.[9] In total, out of the approximately 495 cases that have been filed regarding Smith & Nephew hip implant products over the past four-plus years, only 63 remain pending, compared to 432 that have been closed.

---

[8] Similarly, Movants identify only two conversion cases pending in federal courts.

[9] Tellingly, in light of pending preemption motions to dismiss, plaintiffs in the Crews, Kruse, and Zingler cases have requested a stay of the district court proceedings pending this Panel's decision. *See Crews,* Motion to Stay [D.E. 11 in 16-cv-00471] (E.D. Ky. Feb. 18, 2017); *Kruse,* Motion to Stay [D.E. 12 in 16-cv-03117] (D. Colo. Feb. 18, 2017); *Zingler*, Motion to Stay [D.E. 11 in 16-cv-01599] (E.D. Wis. Feb. 17, 2017). Smith & Nephew opposes those motions.

In cases that remain, Smith & Nephew has produced discovery based on individual plaintiff's circumstances and available theories of liability. For example, in *Raab*, where the court ruled that plaintiff's claim for failure to file adverse events reports was limited to reports that pre-dated her surgery, Smith & Nephew has produced a relevant set of complaint files relating to Ms. Raab's specific hip replacement construct that pre-dated her surgery. *See* June 30, 2016 Hr'g Tr. (Ex. A) at 24:12-19, 28:10-20, 30:5-11, 33:9-14, 37:16-38:1, 43:21-23, 45-22:25 (ordering discovery of limited set of complaint files and root cause analyses within specified time period, and denying motion to compel discovery of marketing, advertising, and training materials, communications related to product design, and engineering change orders). Centralization of cases at this stage would thwart the benefits and efficiencies of these prior preemption rulings by opening the door to broad discovery not accurately tailored to the remaining claims in a specific case.

Centralization would further be counterproductive because the pending cases can be informally coordinated to the extent any overlap of relevant information exists. Smith & Nephew has, and will continue to, informally coordinate discovery and scheduling across cases. For example, Smith & Nephew has agreed that 30(b)(6) depositions taken in federal cases can be used in state court, transcripts have been shared across cases, and informal productions of the BHR PMA and Annual Reports will be provided.

**ARGUMENT**

Pursuant to 28 U.S.C. § 1407(a), the Panel should only establish an MDL where cases "involv[e] one or more common questions of fact," and where "transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." The burden is on the moving party to establish that centralization of

the subject cases is warranted. *See In re G.D. Searle & Co. "Copper 7" IUD Prods. Liab. Litig.*, 483 F. Supp. 1343, 1345 (J.P.M.L. 1980). Even where one or more common questions of fact exists, the moving party still must show that disadvantages of transfer do not outweigh the benefits. *Id.* The Panel "typically den[ies] centralization of cases in which the primary dispute concerns a legal, as opposed to factual, question." *In re OSF Healthcare Sys. Empl. Ret. Income Sec. Act Litig.*, --F. Supp. 3d--, 2016 WL 7221923 (J.P.M.L. Dec. 7, 2016). "Centralization under Section 1407 should be the last solution after considered review of all other options" (internal quotation marks omitted). *In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011).

## I. NO MDL SHOULD BE CREATED

As set forth above, Smith & Nephew metal-on-metal hip implant products have been on the market in the United States for more than a decade, and cases regarding these products have been litigated since 2010. Nevertheless, Movants waited until the vast majority of cases were resolved before moving for centralization in an MDL, seemingly in an effort to revitalize stale litigation through the establishment of a common venue. *See In re CVS Caremark Corp. Wage & Hour Emp't Practices Litig.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010) (although "the Panel's primary purpose is not to divine the motives and strategies of the various litigants," it weighs against centralization where a "motion appears intended to further the interests of particular counsel more than those of the statute"). Although Movants assert that they "expect that dozens of additional cases involving the BHR and R3 will be filed in the future," (Pls. Br. at 3) the Panel consistently has rejected bare assertions about potential future filings as a basis for centralization. *See, e.g.*, *In re Cal. Wine Inorganic Arsenic Levels Prods. Liab. Litig.*, 109 F. Supp. 3d 1362, 1363 (J.P.M.L. 2015) ("Where only a minimal number of actions are involved,

the proponent of centralization bears a heavier burden to demonstrate that centralization is appropriate . . . . Although plaintiffs assert that the number of actions is likely to expand, the mere possibility of additional actions does not convince us that centralization is warranted."); *In re Qualitest Birth Control Prods. Liab. Litig.*, 38 F. Supp. 3d 1388, 1389 (J.P.M.L. 2014) ("As we have stated previously, 'we are disinclined to take into account the mere possibility of future filings in our centralization calculus.'").

The establishment of an MDL at this stage would not serve the "convenience of parties and witnesses," nor would it "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a); *see also, e.g.*, *In re Qwest Commc'ns Int'l, Inc., Sec. & ERISA Litig.*, 395 F. Supp. 2d 1360, 1361 (J.P.M.L. 2005) (emphasizing, in denying centralization, that "pretrial proceedings ha[d] been ongoing . . . for over four years"). Rather, as evidenced by the disposition of the majority of the litigation involving Smith & Nephew metal-on-metal hip implant products, the parties are already successfully and expeditiously resolving these cases. *In re "Copper 7" IUD Prods. Liab. Litig.*, 483 F. Supp. at 1345 (denying centralization where "the parties have been expeditiously preparing these actions for trial or disposition by other means"). Establishing an MDL now would only delay those efforts, forcing the parties to shift focus from resolution to, among other things, the selection of lead plaintiffs' counsel, consolidated pleadings, and the establishment of new discovery protocols and procedures.

Moreover, as set forth above, the pending cases involve different causes of action, as limited by different preemption rulings applicable to each individual plaintiff. This too renders these cases unfit for centralization. *See, e.g., In re CVS Caremark Corp. Wage & Hour Empl't Practices Litig.*, 684 F. Supp. 2d at 1379 ("The presence of procedural disparities among constituent cases is another factor that can weigh against centralization."). Indeed, the Panel has

recognized that it "typically den[ies] centralization of cases in which the primary dispute concerns a legal, as opposed to factual, question." *In re OSF Healthcare Sys.*, 2016 WL 722193 at *1; *see also In re: LVNV Funding, LLC, Time-Barred Proof of Claim FDCPA Litig.*, 96 F. Supp. 3d 1376, 1377 (J.P.M.L. 2015) (denying centralization where "[t]he primary dispute between the parties appears to concern whether the Bankruptcy Code . . . 'preempts' application of" plaintiffs' claims); *In re: Teamster Car Hauler Prods. Liab. Litig.*, 856 F. Supp. 2d 1343 (J.P.M.L. 2012) (denying centralization where preemption was at issue in subject cases, because "Section 1407 does not, as a general rule, empower the Panel to transfer cases involving only common legal issues"). Even where preemption rulings have not yet been entered in pending cases, the individual issues involved in determining whether a "parallel" claim exists and has been pled under state-specific tort law would overwhelm questions common to the preemption analysis. *See, e.g., Williams*, 123 F. Supp. 3d at 741-47 (extensively addressing "Maryland tort law" to determine which of plaintiff's claims parallel the federal requirements).

Movants have not satisfied their burden to show that 28 U.S.C. § 1407(a) is satisfied, and their Petition should be denied.

## II. TO THE EXTENT ANY MDL IS ESTABLISHED, IT SHOULD BE BHR-ONLY AND NOT INCLUDE R3 ML OR CONVERSION CASES.

If an MDL were to be established over Smith & Nephew's objection, it should not include R3 ML or conversion cases. Movants themselves acknowledge that consolidation of "the BHR and R3 cases together in the same MDL" may not be appropriate, alternatively requesting consolidation of only BHR cases. Pls. Br. at 7.

As set forth above, the BHR and R3 ML/conversion cases involve devices with different designs and no overlapping components, used in different procedures, contain different labeling and indications for use, have been subject to different recalls/market actions, utilize different

marketing, and involve different regulatory approval or clearance. And whereas plaintiffs in R3 ML (and conversion) cases allege off-label promotion, there are no such allegations in the BHR cases. In short, the myriad distinctions between BHR and R3 ML/conversion cases would swamp any issues that are common across these product lines. *In re Power Morcellator Prods. Liab. Litig.*, 140 F. Supp. 3d 1351, 1353 (J.P.M.L. 2015) (The Panel is "typically hesitant to centralize litigation" where issues pertaining to "product design, development, testing, warnings, and marketing will predominate over the common issues.").

Although individual issues across product lines typically arise where centralization is sought for cases involving multiple defendants' products, *see id.*, the same reasoning holds here, in light of the significantly different legal theories available in BHR cases versus R3 ML/conversion cases. The regulatory differences between the components involved in these groups of cases implicate diverging applications of federal preemption law, and, as a result, different available causes of action that will present entirely distinct legal and factual questions. Several of the "common questions" that Movants purport to identify cannot possibly span across these different classes of cases. *See* Pls. Br. at 6. For instance, the first "common" question that Movants identify is explicitly limited only to "the BHR device" and has limited, if any, relevance to R3 ML or conversion cases. *Id.* Likewise, although Movants identify failure to warn patients and physicians (question no. 2) and defective design (question no. 5) as "common questions," *id.*, these are precisely the types of allegations that already have been eliminated from BHR cases as expressly preempted. *See, e.g., Williams*, 123 F. Supp. 3d 733; *Marion*, 2016 WL 4098608; *Spellman v. Smith & Nephew, Inc.*, 2016 WL 5364206.[10]

---

[10] Even with regard to BHR cases only, preemption rulings eliminate several of the "common questions" that Movants identify. *See e.g.*, Pls. Br. at 6 (identifying failure to warn, negligent misrepresentation, fraud, and manufacturing defect among purportedly "common questions");

Similarly, the different approval/clearance mechanisms and available causes of action in BHR and R3/conversion cases will result in different discovery. For example, while discovery pertaining to BHR cases will be targeted towards Smith & Nephew's compliance with PMA requirements, only in R3 ML and conversion cases could issues pertaining to alleged design defects, the adequacy of warnings provided in product labeling, sales representative activity, and marketing materials arguably be relevant. *See, e.g.*, *Williams*, 123 F. Supp. 2d 733; *Marion*, 2016 WL 4098608; *Spellman*, 2016 WL 5364206 (eliminating claims from BHR cases that are expressly preempted by federal law). Likewise, the witnesses relevant to BHR and R3 ML/conversion cases are distinct. Different personnel were involved in these products' designs and regulatory approval or clearance, and employees knowledgeable about sales and marketing will only be relevant, if at all, in R3 ML cases.[11]

Centralizing BHR and R3 ML/conversion cases would ignore these distinctions, and allow plaintiffs with limited theories or remaining claims access to broad and largely irrelevant discovery. Separate discovery tracks would not advance judicial efficiency in this matter. Given the plaintiff-specific issues that dominate the remaining narrow claims and relevant issues, a multitude of discovery tracks would be required to ensure that discovery relevant and proportional to a plaintiff's remaining claims is allowed in each case.[12] *See* Fed. R. Civ. P. 26 (b)(1) (requiring that discovery remain "proportional to the needs of the case").

---

*Marion,* 2016 WL 4098608 (dismissing defective manufacturing, failure to warn, negligent misrepresentation, fraud claims as preempted).

[11] This is due to the preemption of warning claims in BHR cases and the lack of any off-label promotion allegations.

[12] For example, a discovery track for all BHR cases would combine discovery related to physician training in *Marion* with manufacturing defect discovery in *Laverty* and breach of express warranty claims in *Williams*. *See Marion*, 2016 WL 4098608 at *4; *Laverty v. Smith & Nephew, Inc.*, -- F. Supp. 3d --, 2016 WL 3444191 (N.D. Ill. June 23, 2016) at *2, *4; *Williams*,

And because of the difference in the availability of an express preemption defense between BHR and R3 ML/conversion cases and the entry of preemption orders in BHR cases, reliance on other metal-on-metal hip MDLs involving multiple products is misguided. *See* Pls. Br. at 1 (identifying other metal-on-metal hip MDLs). *None* of those MDLs, to Smith & Nephew's knowledge, centralized Class II 510(k) device-related cases with Class III PMA device-related cases subject to preemption orders prior to centralization.[13] For instance, *In re Stryker* and *In re Biomet* (Pls. Br. at 7 n.6) only involved products cleared through § 510(k), such that there were no preemption hurdles that created inherently divergent factual and legal issues between the product lines included in those MDLs.

Finally, as set forth above, the parties in R3 ML cases have expeditiously resolved these cases, such that resort to an MDL is unwarranted. Movants only identify four R3 ML cases remaining in federal court, and the parties remain engaged in efforts to resolve several of those cases. Centralization that encompasses the R3 ML cases would only delay those efforts. Where only a minimal number of cases remain pending, and the parties are effectively working towards resolution, centralization is typically not warranted. *See, e.g., In re Xytex Corp. Sperm Donor Prods. Liab. Litig.*, MDL No. 2751, 2016 WL 7222067 (J.P.M.L. Dec. 7, 2016) (centralization was not warranted where litigation only involved 6 actions); *In re "Copper 7" IUD Prods. Liab.*

---

123 F. Supp. 3d 733, at 743-45. A separate discovery track for R3 ML and conversion cases is similarly infeasible. *Compare LaFountain* 2016 WL 3919796 (allowing claim based on failure to report adverse events) *with Raab*, 150 F. Supp. 3d at 699-701 (allowing design defect, failure to warn, and breach of implied warranty of merchantability claims).

[13] Indeed, the only metal-on-metal MDL that appears to have involved any device approved through the PMA process at the time of centralization is MDL 2329, *In re: Wright Med. Tech., Inc., Conserve Hip Implant Prods. Liab. Litig.* But there, unlike here, preemption had not been litigated and the claims had not been narrowed – if not entirely eliminated – prior to centralization. In fact, no motions pertaining to preemption had been filed in any cases identified in the Schedule of Actions with that petition.

*Litig.,* 483 F. Supp. at 1345 ("the parties have been expeditiously preparing these actions for trial or disposition by other means").

Therefore, although Smith & Nephew opposes the establishment of any MDL regarding its hip implant products, if an MDL is established, it should not include R3 ML or conversion cases.[14]

## III. TO THE EXTENT AN MDL IS ESTABLISHED, THE WESTERN DISTRICT OF TENNESSEE IS UNIQUELY SITUATED AS THE MOST LOGICAL AND CONVENIENT VENUE.

Movants acknowledge that the Western District of Tennessee, in which Memphis is located, is Smith & Nephew's U.S. headquarters. Pls. Br. at 8, 9. The majority of company witnesses who could provide information relevant to this litigation are likewise located in Memphis, making the Western District of Tennessee, Western Division (Memphis) an appropriate forum for any MDL that is established over these cases. *See, e.g., In re Biomet M2A Magnum Hip Implant Prods. Liability Litig.*, 896 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012) (centralizing cases near defendant's headquarters); *see also In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, MDL No. 2738, 2016 WL 5845997, at *2 (J.P.M.L. Dec. 2016) (same); *In re Hypodermic Prods. Antitrust Litig.*, 408 F. Supp. 2d 1356, 1357 (J.P.M.L. 2005) (same).

Moreover, the Western Division of the Western District of Tennessee is located in Shelby County, Tennessee, the location of previously consolidated state court proceedings regarding Smith & Nephew metal-on-metal hip products. Coordination efforts between the Shelby County litigation and any federal MDL that is established would be advanced by placing the federal

---

[14] To the extent an MDL is established with regard to BHR, but not R3 ML and conversion cases, the Panel should rename the litigation "In Re: Smith & Nephew BHR Hip Implant Products Liability Litigation." *See* MDL No. 2775 Civil Docket.

cases in close proximity to mature state court proceedings that have already functioned successfully in a consolidated capacity.[15] The current number of MDLs and case loads of judges in the Western District of Tennessee further supports transfer to that jurisdiction if an MDL is created. In particular, there is only one MDL currently pending in the Western District, and that case involved only 6 pending actions as of January 17, 2017.[16] There were 414 cases filed per judge in the Western District for the 12-month period ending September 30, 2016, lower than almost every district proposed by Movants in their Petition.[17] Moreover, the Western District of Tennessee, Western Division has a number of seasoned judges with prior MDL experience – like Judges Jon Phipps McCalla and Samuel H. Mays – who would be well-suited to oversee any MDL involving these cases.

Finally, Memphis is in close proximity to both the Midwest and Northeast, where several cases are pending, *see* Pls. Schedule of Actions [D.E. 1-2], and is home to an international airport. Direct flights to Memphis International Airport are available from dozens of cities, and indirect flights are available from virtually any other location. *See* http://www.flymemphis.com/nonstop-destinations# (last visited Feb. 21, 2017). Counsel will already be traveling to Memphis to depose Smith & Nephew witnesses, making it a convenient and logical location for any MDL.

---

[15] Movants argue that these Shelby County cases have not been removed to federal court, Pls. Br. at 9, but that is only because, as Movants acknowledge, Smith & Nephew is a resident of Tennessee, *id*., and as a result, there is no basis for removal.

[16] MDL Statistics Report – Distribution of Pending MDL Dockets by District, http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-February-15-2017.pdf (last visited Feb. 21, 2017) (hereinafter "MDL Statistics Report").

[17] U.S. District Courts Combined Civil and Criminal Federal Court Management Statistics http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2016/09/30-3 (last visited Feb. 21, 2017) (hereinafter "District Court Statistics").

By contrast, no Smith & Nephew witnesses are likely to be located in any of the forums that Movants identify. *See* Pls. Br. at 7-8. Moreover, the District of Maryland (*see* Pls. Br. at 7-8) is already the forum for three other MDLs, *see* MDL Statistics Report. The Southern District of West Virginia and the Northern District of Illinois (Pls. Br. at 8) similarly have a significant number of MDLs already pending,[18] and heavy caseloads.[19] Additionally, in the Northern District of Illinois, the only judge presiding over an active Smith & Nephew metal-on-metal hip case is already presiding over a large MDL. *See* MDL Statistics Report; Pls. Br. at 8 (identifying Judge Kennelly, "who presides over MDL 2545"). Although Movants identify other judges in the Northern District of Illinois who have handled Smith & Nephew hip implant cases, each of those judges handled only one case each, and all of those cases were voluntarily dismissed by plaintiffs during the preliminary stages, such that these judges would have only limited "familiar[ity] with Smith & Nephew BHR device litigation." *Id*.[20]

In short, to the extent these cases are centralized in an MDL, the Western District of Tennessee, Western Division is uniquely positioned as the most convenient forum.

---

[18] *See* MDL Statistics Report (6 MDLs pending in Southern District of West Virginia, and 14 MDLs in Northern District of Illinois).

[19] During the 12-month period ending September 30, 2016, 2,565 actions were filed per judge in the Southern District of West Virginia, the most of any district. 21,378 (or 30.8%) of cases in the Southern District of West Virginia are over three years old, as compared to the national average of 14.3%. And the median time between filing to disposition in a civil case is 31.9 months, as opposed to the national average of 8.5 months. In the Northern District of Illinois, judges have 814 pending cases on average, compared to 519 in the Western District of Tennessee. *See* District Court Statistics.

[20] Although Movants also point to cases pending in the District of Utah, the District of Colorado, and the Southern District of Mississippi, *id*. at 9, none of the cases in any of those districts have progressed to the point that judges overseeing them would have a material advantage over any other district court judge to whom the cases could be transferred.

## CONCLUSION

For the foregoing reasons, this Panel should deny the Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Consolidated Pretrial Proceedings. To the extent any MDL is created, it should include BHR cases only and it should be consolidated in the Western District of Tennessee, Western Division.

Dated: February 22, 2017

Respectfully submitted,

*/s/ Sara J. Gourley*

Sara J. Gourley
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
sgourley@sidley.com
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Counsel for Smith & Nephew, Inc.*